### INTERSTATE IRON & STEEL CO. v. NORTHWESTERN BRIDGE & IRON CO.*

(Circuit Court of Appeals, Seventh Circuit. January 3, 1922.)

No. 2988.

1. Contracts ⬳10(4)—Calling for monthly deliveries on specifications to be furnished unenforceable, when providing for automatic cancellation, if tonnages not called for as provided.

   A contract for the manufacture and sale of iron and steel bars, to be delivered in monthly installments on specifications to be furnished by the buyer, was unenforceable for want of mutuality, where it provided that, if the tonnages were not specified as called for, the contract should be automatically canceled.

2. Sales ⬳81(5)—Provision requiring buyer to make periodical specifications of requirements is material.

   A provision in a contract of sale requiring the buyer to make periodical specifications of his requirements of substantially equal quantities is not a mere formality to be observed or not, but a material provision, and the parties will be held to its observance, especially where the seller is a manufacturer and the articles are of various dimensions, which the manufacturer cannot know until the buyer specifies them.

3. Contracts ⬳153—Every part should be given effect, where possible.

   Every part of a written instrument should be given effect, so far as possible.

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 258 U. S. —— 42 Sup. Ct. 461, 66 L. Ed. ——.

**4. Sales ☞58—Written portions prevail over formal printed provisions.**

In a contract for the manufacture and sale of iron and steel bars, to be delivered in monthly installments on specifications to be furnished by the buyer, a written provision that, if the tonnages were not specified as called for, they should be automatically canceled, prevailed over recitals of a sale and purchase in the printed portions of the contract, if inconsistent therewith.

**5. Sales ☞58—Terms "buy" and "sell" not given ordinary signification, when contract shows subject of contract was to be manufactured.**

The employment in a contract of the terms "buy" and "sell" expresses a conclusion which must be controlled by the particular things called for, and if, notwithstanding such terms, it appears that the parties were dealing with reference to something which had no existence, and could therefore not be the subject of a present sale, but had first to be manufactured after the buyer made timely requisition therefor, such terms cannot be given their significance, as applied to things existent and capable of immediate sale and delivery.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Buy ; Sell.]

**6. Sales ☞91—Provision of contract for automatic cancellation of tonnages not specified as required held not mere option for protection of seller.**

In a contract for the manufacture and sale of iron and steel bars, to be delivered in monthly installments on specifications to be furnished by the buyer, a provision that, if the tonnages were not specified as called for therein, they should be automatically canceled, was not a mere provision for the protection of the seller, to be exercised by it or not at its option, especially where another part of the contract provided for cancellation by the seller at its option in case of delay in payment.

**7. Sales ☞50—Failure to assert invalidity as reason for not filling orders held not to waive right to set up invalidity.**

Under contracts for the sale of iron and steel bars for delivery in monthly installments on specifications to be furnished, and providing that, if the tonnages were not specified as called for therein, they should be automatically canceled, the seller did not waive its right to set up the invalidity of the contracts because of the provision for automatic cancellation, by disputing the buyer's right under the contract to specify greater widths than six inches, instead of asserting the invalidity of the contract, or by offering to supply the entire tonnage ordered in lesser widths; it having previously called attention to the provision for automatic cancellation.

In Error to the District Court of the United States for the Eastern District of Wisconsin.

Action by the Northwestern Bridge & Iron Company against the Interstate Iron & Steel Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

The action was for damages for breach of two written contracts to manufacture and deliver iron and steel. Judgment for $35,259.37 went against plaintiff in error.

Northwestern Bridge & Iron Company, of Milwaukee, defendant in error, was a fabricator and erector of structural iron and steel, and plaintiff in error, Interstate Iron & Steel Company, was a manufacturer of iron and steel, with rolling mills at Marion, Ohio, East Chicago, Ind., and South Chicago, Ill. Under date of March 16, 1917, they entered into two agreements, one respecting iron bars and the other steel bars. Both agreements were on the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

regular printed sales contract form of the Steel Company. The iron bars contract, so far as here material, is as follows:

### *"Sales Contract in Duplicate.*[1]

"Quality and Description of Goods.—Interstate Iron & Steel Company, a corporation of the state of Illinois, hereby sells, and *Northwestern Bridge & Iron Company,* of *Milwaukee, Wis.,* hereby buys, the following described goods (which will be used by the buyer in their business), subject only to the conditions herein expressed, viz: *Two hundred (200) tons iron bars,* all of such sizes and sections as are regularly made by seller at its *East Chicago, Ind.,* works.

"Specifications.—Specifications to fulfill this contract shall be given at least thirty days before shipments are to be made, unless otherwise agreed upon. Final specifications to complete contract to be given at least thirty days before expiration of same.

"Terms of Shipment.—Shipments shall be made in installments of about equal quantities monthly, between *March 20, 1917,* and *December 31, 1917,* at the rate of about equal tons per month as near as practicable.

"Prices.—*$3.10 base per 100# half extras. Refined iron bars 15c per 100# extra. It is understood that if the tonnages are not specified as called for in this contract they shall be automatically canceled.*

"Exceptions.—Each month's shipments to be treated as a separate and independent contract, but if buyer fails to fulfill terms of payment under this or other contracts, seller may defer further shipments until payment is made, or may cancel this contract at his option. * * * This contract becomes binding only when signed or approved by the president or vice president of the Interstate Iron & Steel Company, at Chicago, Illinois.

"Remarks.—The specifications on this contract are irrevocable and are not subject to cancellation, suspension of shipment, or to any change in price due to market conditions."

The steel bars contract is in all respects the same, except that in place of iron bars it states *"200 tons steel bars—such sizes as we can roll from our stock of billets."* The Bridge Company made no specifications whatever until June 29, on which date it specified 43½ tons of steel and 31 tons iron; July 26, 98 tons iron; August 23, 22 tons iron and 22 tons steel; September 5, 130 tons iron and 135 tons steel; total iron 200½ tons, and steel 201 tons. On the first steel order there were shipped, August 6, 29½ tons, and October 11, 16 tons, and on August 6, 4¾ tons of the iron order of July 26. No further shipments were made. The specifications were all of widths more than 6 inches, except such as were shipped, which were 6 inches or less.

On receipt of the first iron order, which was all for over 6 inches, Steel Company wrote (July 2), declining to fill order for such widths, stating such were not bars, but plates, and therefore not within the agreements. Bridge Company wrote July 5 stating that Steel Company's agents who solicited the order told buyer it might specify any material enumerated on page 15 of seller's handbook, whereon such greater widths appeared. Seller (after further exchange of letters) replied July 31, saying handbook was no part of contract, that they were not rolling these wider sizes, that the agreements provided for automatic cancellation of specifications not made as provided in the agreements, and that they could not hold the buyer for failure to specify, and refusing to supply widths of over 6 inches. Upon further specifications of widths greater than 6 inches, seller referred buyer to its letter of July 31.

Jacob Newman, Edward R. Johnston, Conrad H. Poppenhusen, and Henry L. Stern, all of Chicago, Ill., and Joseph V. Quarles, of Milwuakee, Wis. (Henry J. Darby, of Chicago, Ill., of counsel, for plaintiff in error.

Lawrence A. Olwell and Bernard V. Brady, both of Milwaukee, Wis., for defendant in error.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

[1] Italics indicate typewritten parts of the instrument.

ALSCHULER, Circuit Judge (after stating the facts as above). [1] The judgment is assailed upon various grounds, but the one which goes to the root of action is the contention that the contracts are not enforceable because of the clause:

"It is understood that if the tonnages are not specified as called for in this contract they shall be automatically canceled."

Plaintiff in error insists that this left it entirely optional with defendant in error to take or not to take any or all of the tonnage, and, no consideration appearing for the agreements to sell, neither party became obligated by the contracts. Contracts with provisions more or less similar, but involving substantially the same principle, have been by this court in a number of cases held to be unenforceable. In American Cotton Oil v. Kirk, 68 Fed. 791, 15 C. C. A. 540, the memorandum of sale of 10,000 barrels of oil provided "deliveries to be made per week as Kirk & Co. (buyers) desire." Passing on the validity of this contract, the court said:

"Suppose Kirk & Co. had not desired and had not ordered any such quantities as would require 100 years to complete the delivery—is there any way open to the defendant to put plaintiffs in default? We think not, and that there is no mutuality of promises for the sale of a definite or ascertainable quantity of oil."

Oakland Motor Car Co. v. Indiana Auto Co., 201 Fed. 499, 121 C. C. A. 319, dealt with an agreement for sale of automobiles, wherein it was provided that no order shall be binding unless accepted by the manufacturer at least 30 days prior to date of delivery, and for cancellation by either party for just cause. There was no question but that the provision for cancellation alone would have rendered the contract unenforceable. But it was contended that the qualification "for just cause" saved the contract from the operation of the rule. The court held that the addition of these words did not exempt the contract from the application of the rule requiring the mutuality of obligation as a necessary element of a binding contract for future sale and delivery. To like general effect are Crane v. Crane & Co., 105 Fed. 869, 45 C. C. A. 96, Velie Motor Car Co. v. Kopmeier Motor Car Co., 194 Fed. 324, 114 C. C. A. 284, and Tweedie Trading Co. v. Parlin & Orendorff Co., 204 Fed. 50, 122 C. C. A. 364, all decided by this court. See, also, Pocatello v. Fidelity, etc., Co., 267 Fed. 181 (9 C. C. A.), and Cold Blast, etc., Co. v. Kansas City, etc., Co., 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696.

[2] A provision in a contract requiring a buyer to make periodical specifications of his requirements of substantially equal quantities is not a mere formality, to be at the will of the buyer observed or not. This is particularly true in a case where, as here, the seller is a manufacturer, and the articles to be made for the buyer are of various dimensions, which the manufacturer cannot know until the buyer specifies them. Such a provision in a manufacturing contract is material, and parties will be held to its observance. Alwart Bros. Coal Co. v. Royal Colliery Co., 211 Fed. 313, 127 C. C. A. 599; Id., 234 Fed. 20, 148 C. C. A. 36; American Steel Foundries Co. v. Indian

Refining Co., 275 Fed. 800, No. 2854, decided by this court April 26, 1921.

[3-5] But it is urged that, because in the formal part of the contracts there is recited a sale and purchase of the commodity, in order to give effect to this part of the contracts they should be held to be sales rather than only options to purchase. It is elementary that every part of a written instrument should be given effect so far as possible. But where there is irreconcilable difference between formal printed portions of· an instrument and other parts of it which are written in, the latter will prevail. Lipschitz v. Fruit Co., 223 Fed. 698, 139 C. C. A. 228. If the effect of this special clause is to make it optional with the buyer whether he will take any of this tonnage, this is inconsistent with the recited sale and purchase, and the special clause would prevail. But, after all, the employment of the terms "buy" and "sell" express a conclusion which must be controlled by the particular things contracted for. If, notwithstanding the employment of these terms, the things actually agreed upon fall short of making a contract of purchase and sale, then no such contract is effected. When from the contract itself it appears that these parties were dealing with reference to something which had no existence, and could therefore not be the subject of a present sale, but that the subject-matter of the contract had first to be manufactured after the buyer made timely requisition therefor as in the contract provided, the terms "buy" and "sell" cannot in any event be given their significance as applied to things existent and capable of immediate sale and delivery.

[6] It is further urged that these contracts fall within the rule announced in Western Union Tel. Co. v. Brown, 253 U. S. 101, 40 Sup. Ct. 460, 64 L. Ed. 803, where it was decided that in a contract for purchase and sale of certain shares of mining stock, on which a payment was made, and the stock delivered to a bank for delivery to the purchaser on payment of the full purchase price, and which contained provision that, in case of default in the further payments, whatever had been paid should be forfeited, and the certificates of stock redelivered, and the rights of the parties forever cease and terminate, this was not to be considered an option terminable at the will of the buyers by their declining to make the further payments, but that the sale was absolute, and that such provision was for the protection of the sellers, to be exercised by them at their option. In our view this case does not fall within that rule. It can scarcely be said that this special provision in the contracts here under consideration was for the protection of the seller only. The buyer may well have desired to protect himself against a situation wherein it would not for a time need the materials. If it had no orders or contracts for bridges and other structures, it might not know what kinds and sizes of materials to specify, and, if it specified in advance of its actual needs, it might have materials which it could not use. Indeed, this was upon both sides a manufacturing contract, the seller being obliged to manufacture the articles as and when specified, and the buyer specifying when its particular requirements were known.

This was evidently so regarded by the parties themselves, since,

under conditions prevailing for over three months after the contracts were executed, the buyer did not see fit to make any specifications whatever, notwithstanding the provision for substantially equal monthly tonnage during the contract period. It does not appear that during this period any communications passed between the parties. The buyer had every reason to believe that the special provision for automatic cancellation operated to cancel each month's tonnage, where no specification was given. As has been seen, it surely could not expect to wait until the end of the contract period, and then, if deemed advantageous, order out the entire 400 tons. Not only does the situation of the parties, as well as the subject-matter of the contracts, forbid the application of the rule in the Western Union Case, but also the nature of the clause itself. If in these contracts, as in that one, there were read in the words "at option of seller," we would have a provision that the tonnage called for should be automatically canceled at option of seller. The two expressions would be quite inconsistent with each other. If the term "automatically," which the parties saw fit to employ, is given any force, it precludes the exercise of an option on the part of anybody as a prerequisite, or any cause or condition, other than the one stated in the clause, viz. the failure to specify the tonnage as called for in the contracts. When, therefore, the parties chose to say that this condition shall automatically cancel such tonnage, they agreed that, upon the occurrence of the condition, the cancellation of such tonnage would be ipso facto effected. The fact that in another part of these same contracts there is provision for cancellation by seller "at his option" would tend further to indicate that the omission of the optional feature from the clause here in question was intentional, and not inadvertent.

[7] This brings us to the claim that there was waiver of the cancellation clause through the subsequent conduct of the parties, largely in that the seller did not in subsequent correspondence state that it would regard the omitted monthly specifications or the contracts themselves as canceled under the clause in question, and that it expressed willingness to supply the tonnage in the material of smaller widths than those which the buyer for most part demanded. Subsequent disputes and negotiations as to what the contracts were intended to cover would not give the contracts validity. If specifications presumably under the contracts are made, and the seller by words or by conduct accepts them, it might be bound thereby, even though of tonnage which under the terms of the contracts might have become canceled. This, however, would not be by reason of waiver of the cancellation, but the effecting of a new contract through the ordering of merchandise and acceptance of the order. It is true that, when the specifications for greater widths than 6 inches were given, the seller did not say, "you are entitled to no material at all, because the contracts are invalid," but it disputed the right of the buyer to specify greater widths than 6 inches.

This was not an acceptance of any of the specifications or orders, and the fact that it disputed the right to supply these widths, rather than to assert the invalidity of the contracts, did not waive or bar its

right thereafter to set up invalidity. Notwithstanding the invalidity, the seller might have been entirely willing to have supplied the full tonnage of the smaller widths: In its letter of July 31, which was long before the specification of the large bulk of the tonnage, it stated to buyer that the contracts provide for automatic cancellations, and its final letter of October 3, referring to the specification of September 5 for the 265 tons, was merely a proposal to supply the entire tonnage in the lesser widths, and it was stated that this was without prejudice to seller's legal rights, if the buyer did not within five days from that date approve the suggestion. This waived nothing, but was merely a proposal to enter into another agreement to supply at the contract prices tonnage which, had the agreements been valid, would at that time have been largely canceled. Even though subsequent transactions might give validity to such contracts, or effect a waiver by the seller of their invalidity, no facts which this record discloses would justify such conclusion here.

There appears here no such situation as was present where contracts seemingly somewhat similar have been upheld, such as contracts to supply a buyer's entire season's requirements, to take a manufacturer's entire output, to sell to the buyer alone all the seller may acquire of a particular article for a definite time. But the contracts here left the buyer with the unqualified right, and with entire impunity, to cancel the contracted tonnage from month to month until at the end of the time fixed none of it remained; both parties being free to buy or sell elsewhere as they saw fit.

These views make it unnecessary to consider the question whether under the contracts widths beyond 6 inches were contemplated, and whether there was error in the admission of seller's handbook, and of conversations of its alleged agents respecting the handbook, and the different dimensions of materials which might be specified under the contracts.

Concluding, as we do, that the contracts are unenforceable, the judgment is reversed, and the cause remanded for further proceedings in consonance herewith.