## CHEVROLET MOTOR CO. v. GLADDING.
### No. 2934.

Circuit Court of Appeals, Fourth Circuit.
June 27, 1930.

William H. Hudgins, of Baltimore, Md., for appellant.

Robert R. Carman, of Baltimore, Md. (Gerald W. Hill and G. C. A. Anderson, both of Baltimore, Md., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and HAYES, District Judge.

HAYES, District Judge.

This is an action for damages for breach of contract. Chevrolet Motor Company (appellant) entered into the contract with Ray V. Gladding (appellee) on August 2, 1926. The contract was in writing and consisted of a "Memorandum," "Appendix," and an "Or-

der" covering a period of twelve months. The pertinent provisions of these instruments are printed in the margin.[1]

The contract contained three provisions for its termination at the option of appellant. It could be canceled without notice if ap-

[1] A. Excerpts from Memorandum.

(1) Seller hereby grants to Dealer the concession to sell new Chevrolet automobiles, chassis, parts and accessories in the territory (but not elsewhere) described and set forth in the 'appendix' hereto, and which appendix is made a part of this agreement as fully as if it and all the matters therein contained were embodied in this agreement.

(2) Dealer hereby accepts the above concession and agrees to make all sales hereunder in accordance with this agreement. Dealer further agrees to work and develop to the satisfaction of Seller the aforementioned territory and not to sell any of such automobiles or chassis outside thereof. Should any such automobile or chassis sold by Dealer be used in the territory of another Dealer, Dealer agrees to abide by the decision of Seller regarding the division of compensation due Dealer in whose territory such automobile or chassis is used.

(3) It is agreed that this agreement does not constitute Dealer, Associate Dealer or Parts Depot the agent or legal representative of Seller for any purpose whatsoever. Dealer is not granted any right or authority to assume or to create any obligation or responsibility, expressed or implied, in behalf or in the name of the Seller, or to bind seller in any manner or thing whatsoever.

(3) (4) This agreement shall continue in force and govern all relations and transactions between the parties hereto until cancelled or terminated, said cancellation to be governed entirely as set forth in the Appendix, which is made a part of this agreement, as stated above.

Any cancellation or termination of this agreement shall also operate as a cancellation of all order for standard automobiles, chassis, parts, equipment or accessories which may not have been shipped prior to receipt of notice of such cancellation or termination by Dealer, but will not release Dealer from payment of any sum which may then be owing Seller, or payment for any special chassis or equipment for same which may have been ordered by Dealer and not shipped by Seller prior to such notice of cancellation or termination. It is understood that any automobile or chassis which may have been ordered by Dealer and which differs in any way from the Standard specifications therefor as adopted by Seller or special equipment of any type shall be considered as special.

(6) Seller agrees that for so long a time as Dealer shall continue to sell new Chevrolet automobiles, chassis, parts and accessories in a manner and to an extent and quality satisfactory to Seller and while this agreement shall be and remain in effect, no other or different person, firm or corporation will be granted the privilege of selling same products in the aforesaid territory, except in such territories as Seller may designate, it being understood that in the event of such exception Seller is convinced that non-exclusive representation is essential in order to secure from such designated territory a proper volume of business. Seller expressly reserves the right to sell any of its products to the United States or any foreign government or any department or bureau thereof, or the American Red Cross, without any obligation to pay Dealer any commissions or other charges upon such sales.

(7) Dealer shall pay to Seller upon each and every shipment of new Chevrolet automobiles, chassis, parts or equipment, Dealer's price from Seller in effect at the time of such shipment and as is set forth in price list attached to this agreement, together with the amount of any Federal, State or Municipal tax which seller has paid or agreed to pay on any such automobiles or chassis.

(8) Dealer shall whenever requested by Seller, notify Seller of his estimated or expected requirements of new Chevrolet automobiles and chassis for such number of months succeeding the date of such notification as Seller may designate. Such estimate will be used by Seller as a basis to determine Dealer's monthly allotment.

(4) (10) If for any reason Seller does not ship during any month the orders specified for that month, such unshipped orders for that month may be cancelled by Seller and be deducted from the Allotment to the Dealer as specified for that month and in such case the Seller and Dealer will be released from any further liability for such month on such unfilled order.

(11) Any order submitted by Dealer in excess of his allotment as provided in the Appendix, may be accepted by Seller at its option and when so accepted shall be deemed to be subject to all the conditions to which orders for motor vehicles under said allotment are subject. And if Seller shall accept from any other Dealer orders in excess of the monthly allotment of such other Dealer, such acceptance by Seller shall not render Seller liable to Dealer for any loss or damage because of the failure of Seller to ship any orders or order to Dealer.

(12) Dealer agrees to maintain a place of business and sales room and service station satisfactory to Seller, and Seller shall have the right at all reasonable times in business hours to inspect said place of business and sales room and service station, and to inspect all records and accounts of Dealer relating to the sale and servicing of new Chevrolet automobiles, chassis, parts and accessories. Dealer agrees, so long as this agreement shall be and remain in effect, at his own expense to comply with each and all of the requirements that now or hereafter may be notified to him in writing by Seller relating to the advertising, sale and servicing by Dealer of new Chevrolet automobiles, chassis, parts and accessories.

(14) Seller will sell Dealer genuine Chevrolet repair parts, and bill same net cash payable the tenth (10th) of the month following date of billing, at a discount and terms specified on the Appendix of Price List hereto, or at such different discounts and terms as may hereafter be established by Seller; provided Dealer shall carry in stock genuine Chevrolet repair parts the amount and kind of which shall be specified by Seller from time to time as Seller may deem necessary to insure good service to owners of Chevrolet automobiles and chassis in Dealer's territory. In stipulating the quantity of genuine Chevrolet parts and accessories to be carried in stock by Dealer, Seller will be governed by the number of Chevrolet automobiles and chassis in Dealer's territory to be serviced, plus Dealer's accepted schedule as submitted from time to time. Seller shall have the right at any reasonable time in business hours to inspect and check over Dealer's stock of repair and replacement parts and if in Seller's judgment a sufficient quantity of parts for repair and replacement purposes are not then in Dealer's stock, Dealer hereby agrees to immediately order such parts as may be recommended by Seller.

(17) In case of the termination of this agreement by either party Seller may, at its option within thirty days after such termination, re-purchase from Dealer at the price paid by Dealer plus the actual freight on shipments to Dealer, all or any part of the new Chevrolet automobiles, chassis, parts, or accessories on hand in Dealer's place of business or in the possession of Dealer, and upon demand and the tender by Seller of the purchase price, Dealer shall be obligated to deliver such goods to Seller forthwith.

(19) Seller is entitled to the use of the word "Chevrolet" as applied to automobiles and chassis, and of the good will attached thereto: If the word "Chevrolet" is used in the name under which the Dealer's business is conducted, or in any sign or

pellee became insolvent, upon 10 days' notice if he did not exclusively represent seller, and upon 60 days' notice if any question arose which threatened the mutually satisfactory business relationship.

On September 27, 1926, the appellant notified appellee of the cancellation of the contract, effective ten days later because dealer was not exclusively representing the seller. No other reason was assigned. The parties had mutually agreed upon 134 cars to be furnished under the contract during the year which were to be delivered in stated quantities and models during each month of the year; 36 of these had been shipped before the cancellation of the contract.

The appellant contends that the contract is unenforceable for want of consideration and mutuality, and relies on the principles announced in the following cases: In re Charles Wacker Co. (D. C.) 244 F. 483; Standard Motor Co. v. Shockey, 139 Md. 136, 114 A. 869; Interstate Iron & Steel Co. v. Northwestern Bridge Co. (C. C. A.) 278 F. 50; Oakland Motor Car Co. v. Indiana Auto Co. (C. C. A.) 201 F. 499; Velie Motor Car Co. v. Kopmeier (C. C. A.) 194 F. 324.

We think this contract has features distinguishing it from each of the authorities cited, and that its construction should be determined by the following cases: Ellis v.

---

advertising displayed by Dealer, Dealer will upon termination of this agreement or upon the request of Seller, discontinue the use of the word "Chevrolet" in such name, sign, or advertising, and thereafter will not use either directly or indirectly in connection with any automobile business the word "Chevrolet" or any other name, title or expression so nearly resembling the same as to be likely to lead to confusion or uncertainty or to deceive the public.

(20) This agreement constitutes a personal contract; and Dealer shall not transfer or assign same or any part thereof without Seller's written consent.

(6) (21) In case Dealer is a co-partnership or a corporation, and disagreements of any nature shall arise between the members of the co-partnership or of the officers or managers of the corporation, whereby Seller deems its interest may be imperiled, or in case of the incapacity, death or insolvency of Dealer, or in case an application is made to have Dealer declared bankrupt, or in case a Receiver or Trustee is appointed for Dealer, then Seller may at its option cancel this agreement without any notice whatsoever to Dealer.

(26) It is understood that the parties may at any time during the continuance of this agreement agree upon and execute a new "Appendix" which shall be attached to this agreement and form part thereof as heretofore provided, as fully as if such "Appendix" had been executed and attached to this agreement at the time of the execution thereof.

That the price list referred to in the Seventh Paragraph of the foregoing agreement, issued by the defendant, in effect from August first, nineteen hundred and twenty-six to July thirty-first, nineteen hundred and twenty-seven, and attached to said agreement was as follows:

#### Dealers' Discounts and Terms
#### Models "K" Series "V" and "Utility Express Truck"
##### (Chassis)

On Series "V" and/or "Utility Express Truck (Chassis) New Cars," a discount of twenty-four (24%) per cent. from the list prices as shown above, or which may subsequently be established, will apply from August 1, 1926, to July 31, 1927, unless otherwise advised:

##### Parts Discounts

Parts on Open Account

Parts will be billed to dealers of record at a discount of 40% from current list prices on all shipments.

"Parts will be billed in carload lots to dealers of record at a discount of 40% and 5% from current list prices, F. O. B. Dealer's shipping point—sight draft against bill of lading—collection charges added."

##### Miscellaneous

It is understood and agreed that our Standard Warranty as shown in your current selling agreement with this Company is null and void on any Chevrolet Model where parts not made or sold by us are used in any replacement or otherwise.

All prices and discounts quoted are subject to the terms of your current selling agreement with this company.

It is understood and agreed that deliveries of all orders are subject to contingencies beyond our control, such as fires, strikes, embargoes, inability to secure material, labor transportation, etc.

This Price List cancels all previous Price Lists and is subject to change without advance notice.

---

#### Chevrolet Motor Company

##### Price List No. M-3

##### Effective August 1st, 1926

##### (Superseding Price List M-2)

| | Model | "K" | Series | "V" | | List | Price | |
|---|---|---|---|---|---|---|---|---|
| o | " | " | " | " | Commercial Chassis | " | " | $375.00 |
| o | " | " | " | " | Roadster | " | " | 510.00 |
| * | " | " | " | " | Touring Car | " | " | 510.00 |
| † | " | " | " | " | 2-Pass. Coupe | " | " | 645.00 |
| * | " | " | " | " | 5-Pass. Coach | " | " | 645.00 |
| * | " | " | " | " | Sedan | " | " | 735.00 |
| * | " | " | " | " | Landau Sedan | " | " | 765.00 |
| z | " | Utility | Express | Truck (Chassis) | | " | " | 495.00 |

*Balloon tires and disc wheel standard equipment on sedan and coupe.
†Balloon tires and artillery wheels standard equipment on coach.
o Balloon tires and artillery wheels on touring car and roadster, $25.00 additional.
z 30x5 S. S. Cord tires for front wheels optional at $45.00 additional.

Dodge Brothers (C. C. A.) 246 F. 764; Moon Motor Car Co. v. Moon Motor Car Co., Inc., (C. C. A.) 29 F.(2d) 3; Buick Motor Co. v. Thompson, 138 Ga. 282, 75 S. E. 354.

The parties intended to make a contract for the sale of automobiles and parts. The seller required dealer to establish a place of business and equip it with parts in order to conduct a service station satisfactory to seller. It agreed to sell him cars and parts at standard dealer's discount, and they mutually agreed on the number of cars for the year at 134, specifically describing them. Dealer testified he intended to perform the contract accordingly, and the manager of seller testified he expected performance. Seller had required dealer to carry a stock of parts which at the time of the contract amounted to about $1,800. The seller took back $626 of the parts, and refused to take the remainder. The contract provided that

the seller, in event the contract was terminated, would take at cost unused automobiles and such of the parts as he could accept. So long as the contract was in force, the dealer was permitted to use the name "Chevrolet," and advertising in the territory was paid by both in order to promote sales. The provisions of the contract and the acts of the parties themselves are consistent only with a construction of a mutual contract imposing reciprocal obligations and equally binding. The clause agreeing not to cancel the contract except upon 60 days' notice shows that the dealer should have that time as seller's dealer to dispose of his cars and parts with all the selling advantages of an accredited dealer. The contract exacted an investment by the dealer, and protected him agains the hazards of the termination of the contract without a notice of 60 days except for the other causes not material here.

---

### Chevrolet Motor Company

(The Dealer should attach this Price list to his agreement with this Company).

### B. Excerpts from Appendix.

This regular appendix, dated August 2nd, 1926 which is an appendix to the Agreement executed between the parties hereto under date of August 2nd, 1926 and which it is agreed shall be part of and subject to all of the terms and provisions of said Agreement and shall cancel and supersede any previous appendix or appendices heretofore existing between the parties hereto.

### Seller Agrees

to sell Dealer new Chevrolet automobiles and chassis, hereinafter described in Price List by Model, terms sight draft, with bill of lading attached (Payable with collection charges) F. O. B. Flint, Michigan, freight charges to be based on published rates from Flint at the time of delivery and without right to reparation in accordance with price list issued by Chevrolet Motor Company from time to time and subject to the terms of said agreement for resale in the following specified territory and in no other, namely:

Non-exclusive selling rights in Dist. Of Columbia; Maryland; Virginia except Dickenson, Wise, Lee, Scott, Russell & Washington Counties: Pennsylvania—Counties of Adams, Franklin, York & in Fulton County, Union, Bethel & Thompson Townships, & that part of Cumberland County lying south and west of the northeast lines of Hopewell & Southampton Townships; Delaware, Sussex County, Dist. #7 (Baltimore Hundred) & Dist. #5 (Little Creek Hundred) lying south of straight line running due east and west through town of Bacon: West Va., the Counties of Berkeley, Grant, Hampshire, Hardy, Jefferson, Mercer, Mineral, Morgan & Pendleton; North Carolina, townships of Pelham, Dan River & Milton, Caswell County.

The Dealer agrees that he will use a standard method or system of Accounting for his business that will show his actual financial position each month and that he will furnish to Seller upon request a statement which shall show such financial position.

The Dealer agrees to purchase and erect immediately in a conspicuous place outside his Show Room, a standard Chevrolet electric sign, provided the erection of said sign is not prohibited by any local City Ordinance.

The Seller will add Five Dollars ($5.00) to the in-

voice of each new Chevrolet passenger car, commercial chassis and truck. The money collected from this source will establish a Chevrolet Dealers' Advertising Fund. (12) To this fund the Seller will contribute Two Dollars and fifty cents ($2.50) for each Five Dollars Collected from the above mentioned source. The money obtained in this manner for Dealer's Advertising Fund will be spent by the Seller in the placement of Dealer's local advertising through the channels of billboard, newspaper advertising, and such other methods of advertising as in the judgment of the Seller will be of benefit to its Dealers.

The Seller will put forth its best efforts to accomplish a proportional distribution of this advertising, and will particularly endeavor to expend the full amount paid by the Dealers in their respective vicinities. The portion of the fund contributed by the Seller will be used for advertising purposes for the Dealers which in the judgment of the Seller will be best calculated to still further add to the Dealers' interests. In carrying out this advertising program the Seller will as far as practicable arrange to place in the advertisement the local Dealer's name and address. In cities where more than one Dealer is located the names of all Dealers will be carried, if in the judgment of the Seller this will be practicable; otherwise a slogan for the interest of all Dealers will be used.

Dealer agrees to purchase such Road Signs as are necessary to properly advertise his business on a mutually satisfactory basis as between the Dealer and Seller, it being understood that the cost of road signs is not to be met from the Chevrolet Dealers' Advertising Fund.

The Dealer further agrees in order to render proper service to his customers to buy such special tools as have been developed by Seller from suppliers as may be mutually satisfactory between Dealer and Seller after Seller has made an examination of the service conditions in Dealer's place of business and in his territory.

During the life of this Agreement and Appendix or until otherwise advised by Seller, the Dealer will, on forms provided by Seller furnish the Chevrolet Motors Company, not later than July 15th of each year, with a signed order, covering allotment of models by months, for the following season of twelve (12) months from August 1st next such signed order being a mutually agreed allotment between seller and dealer.

During the months of October, November, December, January, February, and March of each selling

It is contended that the seller could cancel the order for any month without incurring liability, but this privilege does not carry a right to act arbitrarily. The contract properly construed confers no discretionary right on seller to refuse to sell the cars and parts. If the seller did not regard the contract as binding it to performance, why did it make the provisions for the cancellation?

Clause 11 relates to automobiles ordered in excess of allotment. Such orders when accepted by seller "shall be deemed to be subject to all the conditions to which orders for motor vehicles under said allotment are subject. And if seller shall accept from any other Dealer orders in excess of the monthly allotment of such other Dealer, such acceptance by Seller shall not render Seller liable to Dealer for any loss or damage because of the failure of Seller to ship any orders or order to Dealer." If the seller did not intend to be bound to ship the cars ordered on the allotment and did not think it was bound to do so, it is difficult to apprehend why it expressly absolved itself from liability for failure to ship accepted orders in excess of the allotment. This clause confirms our construction of the contract holding that it is not lacking in mutuality or consideration. [3, 4] Appellant contends that, if the contract is enforceable, the damages should have been limited to such as accrued within 60 days, for, it contends, the seller had the right to cancel the contract on 60 days' notice when

---

year, in case the Dealer fails to accept and pay for models as allotted by months, then the Seller will, in lieu of shipping pursuant to such allotment supply the Dealer from time to time with models properly balanced so that he shall have on hand approximately 15% of the twelve (12) months' supply specified in the shipping order. It being mutually intended hereby that the Dealer shall not at any time be required to carry unsold cars in excess of 15% of his yearly allotment, and that the Seller shall be entitled to ship up to that amount. Anything herein contained to the contrary notwithstanding. In any event, should the Dealer's unsold stock in any of the months above mentioned equal 15% of his annual allotment, the Seller will discontinue shipping unless the Dealer desires more cars and Seller is able to furnish them.

It is further agreed that the seller will not in any (13) one of the above mentioned months, while building up the car stocks on the basis as referred to above, ship the dealer cars to exceed (10) per cent. of the total annual quota as specified in the Dealers' Shipping Order, unless the Dealer requests shipments in excess of said 10%. The Dealer agrees to keep the Seller advised at all times of the condition of his car stocks and the movement of same.

In further consideration of the full and complete exercise of all parts of this agreement and appendix, the seller agrees with the Dealer that should at any time any question arise that threatens to interfere with their mutually satisfactory business relationship, Seller will not cancel this Agreement except on sixty (60) days notice, with the further proviso that the only exception to the foregoing will be in the case of the Dealer not being an Exclusive Chevrolet Dealer, in which case this contract may be cancelled on ten days' written notice by registered mail. If cancelled, Seller is to have the privilege of repurchasing at cost of same to Dealer, less the charge for Chevrolet Dealers' Advertising Fund, any of Seller's new current models which Dealer may have on hand in first class condition unsold and which have not been used. This does not apply to demonstrating cars, which will not be considered for repurchase by Seller.

"The Dealer agrees that he will sell Chevrolet cars at not more than the current list prices as may be put in effect from time to time by Seller, plus other usual charges, such as wartax (if any in effect), proportionate double-decking charge (if any in effect), proportionate handling charge (if any in effect) and freight-charge as above specified for model as designated below." Prices of various models are stated here.

"The Seller will, from time to time during the life of this Agreement and Appendix, make such arrangements with the Dealer as will insure the Dealer against loss by reason of price decline of new unused Chevrolet cars and commercial vehicles on hand at time of such price reduction."

### C. Order.

Chevrolet Motor Company, a New Jersey Corporation.

Subject to terms of my our current selling agreement and appendix thereto with the Chevrolet Motor Company, please enter my, our order and ship monthly the cars specified below.

Name R. V. Gladding  Address  Pocomoke City, Md.
Ship to "  "   "   Address   "   "   "
Ship via Penn. R. R.
Draw through Citizens Nat'l Bank, Pocomoke City, Md.

### Superior

| | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Touring | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 8 |
| Roadster | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 5 |
| Sedan | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 6 |
| Utility Coupe | 3 | 2 | 2 | 1 | 1 | 2 | 2 | 4 | 3 | 3 | 2 | 1 | 26 |
| Coach | 4 | 3 | 3 | 2 | 1 | 2 | 3 | 6 | 5 | 5 | 5 | 4 | 43 |
| Landau | 3 | 2 | 2 | 1 | 1 | 1 | 1 | 3 | 3 | 3 | 2 | 1 | 23 |
| Commercial Chasis | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 3 |
| Ton Truck | 2 | 2 | 2 | 1 | 1 | 1 | 1 | 3 | 2 | 2 | 2 | 1 | 20 |
| Total | 16 | 12 | 11 | 5 | 4 | 6 | 9 | 20 | 16 | 15 | 13 | 7 | 134 |

Any orders specified above and not shipped for any reason whatsoever during any current month may be automatically cancelled and deducted from above allotment, in accordance with terms of current selling agreement and appendix thereto.

R. V. Gladding,
Dealer.
O. W. Heatwole,
Chevrolet Representative.

any question arose which threatened the mutually satisfactory business relationship; that such a question had arisen. These questions were properly presented by request for instructions and exception to the court's refusal to give them. No such defense was pleaded or proven. Nor was the contract canceled under this provision. It was canceled on 10 days' notice for the alleged failure of dealer to exclusively represent seller. Dealer insisted that he was not interested in the sale of other cars; seller contended he was, and offered evidence to show that he furnished finances and negotiated a contract for his sons for the sale of other cars. For this reason seller denied a breach of the contract. That was the issue raised; it was the issue to which the evidence was directed, it was the issue to be tried. While there was persuasive evidence on this issue in favor of appellant's contentions, the evidence was conflicting, it was a jury question, and the jury found in favor of appellee. We find no error in the charge of the court nor in its refusal to give the requested instructions.

█ When a party to a contract elects to cancel it under one or more alternative provisions conferring such a privilege, he should assign his cause and abide by it. He cannot assign one cause and cancel it, then, after being sued for wrongful cancellation, come into court and say he may have erred in respect of the cause assigned, but another cause does exist, and he is not liable. This court in Luckenbach Co. v. Grace, 267 F. 676, 679, said: "But the further and equally conclusive answer is found in the settled rule of law that one who breaches his contract for reasons specified at the time will not be permitted afterwards, when sued for damages, to set up other and different defenses." Wall Grocer Co. v. Jobbers' Overall Co., 264 F. 71 (C. C. A. 4th Circuit); McCreary v. Strongman (C. C. A.) 6 F.(2d) 441; Robb v. Crawford, 56 App. D. C. 394, 16 F.(2d) 339; Ohio Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693.

While the contract might have been terminated for various reasons before its performance was completed, the appellant eliminated these questions when it elected to cancel for the reason assigned, which the jury finds groundless. The court under appropriate instructions submitted the correct principles applicable to the damages recoverable.

█ Error is assigned to the ruling of the court sustaining objection to a question asked by appellant as to the trade meaning of the word "Exclusive." It does not appear what the witness would have said. This constitutes no reversible error. Maryland Casualty Co. v. Simmons (C. C. A.) 2 F.(2d) 29.

[8, 9] The court admitted over appellant's objection a letter written by Gladding's banker to Mr. Hatch, appellant's manager. The letter was dated July 28, 1926, and the contract was not finally consummated until August 2. Mr. Hatch had stated voluntarily that he read a letter about that time (July 28, 1926) from Mr. Gladding's bank to the effect that Mr. Gladding had loaned his boys $2,000. Without deciding that the letter was competent, we are unable to see anything in it which prejudiced the appellant. It is true the banker expressed the opinion that the loan would not impair the financial ability of Mr. Gladding, nevertheless appellant has not contended that Mr. Gladding was not financially able to perform his contract. Since it could not affect the result, its admission does not constitute reversible error. Appellate courts as a rule do not grant new trials except where it is apparent the trial court has committed error which is capable, at least, of affecting the result.

The judgment below is affirmed.

PARKER, Circuit Judge (dissenting).

The contract sued on is not one for the unconditional sale and delivery of a definite number of automobiles. It is one granting to the local dealer a "concession" to deal in automobiles, automobile parts, etc., manufactured by defendant, and providing for an allotment of cars annually, the delivery of which, however, is to be dependent upon a number of contingencies. It provides, among other things, that any cancellation or termination of the contract shall operate as a cancellation of all orders for automobiles, parts, etc., which shall not have been shipped prior to receipt of notice of cancellation. The contract specifies no definite time during which it is to continue and be binding upon the parties; and there is nothing in it to prevent cancellation by the seller at any time, except the provision that seller shall not cancel except upon 60 days' notice, with the proviso, however, that, in the event the dealer shall not represent the seller exclusively, the latter may cancel upon 10 days' notice.

The seller canceled the contract, giving notice of cancellation under this 10-day proviso, but the verdict of the jury amounts to a finding that there was no violation of the provision for exclusive representation which would justify this 10-day notice. The action

of the seller, therefore, in canceling the contract without giving the 60 days' notice amounted to a breach of the provision of the contract requiring such notice. It did not, however, entitle the dealer to recover as damages the anticipated profit on the entire year's allotment of cars, but merely the profit on those to which he would have been entitled if the provision as to 60 days notice had been observed. I think that for this reason there was error in the instruction on the measure of damages.