**WOOD MOTOR CO., Inc. et al. v.
NEBEL et al.**

**No. 6526.**

Court of Civil Appeals of Texas.
Texarkana.

July 27, 1950.

Rehearing Denied Oct. 5, 1950.

Geo. Prendergast, Marshall, for appellants.

Gist & Wilson, Tyler, Joseph P. Witherspoon, Austin, for appellees.

WILLIAMS, Justice.

Appellant Wood Motor Company, Inc., styled "direct dealer," the defendant below, and appellees C. W. Nebel, Jr., and his father, d/b/a Nebel Motor Company, styled "associate dealer," in June, 1944, entered into a written contract, for the alleged breach of which, the basis of this suit, appellees were awarded judgment for $25,000 damages. The contract consists of two instruments styled "De Soto and Plymouth Motor Vehicles Associate Dealer Agreement" and "De Soto and Plymouth Vehicle Associate Dealer Terms of Purchase," which we will refer to respectively as the main or sales agreement and the purchase agreement.

No cars were in production when the agreement was executed on account of the war in progress. The testimony given by litigants reflects that they expected rapid sales and good profits on the cars upon the resumption of automobile production at the war's end and the agreement was made with this end in view. Appellants' President testified that Chrysler Corporation informed him "it was going to be necessary to have our dealer points covered to handle the number of expected cars." Appellees with the same expectation proceeded to and

did at his own expense secure and remodel a building suitable for the automobile business; install and equip a service department, office and bookkeeping department; display signs; stocked up with parts and accessories; and conducted a series of newspaper advertisements. A substantial if not all of above program had been completed prior to the production of new cars in January, 1946.

In January, 1946, appellant began to receive new cars, and during that year received a total of 190 Plymouths and 77 De Sotos. Of this number appellant delivered to appellees in January, 1946, one De Soto and one Plymouth and none thereafter. Appellant retained during above period for resale in the Marshall, Texas, area 75 Plymouths and 36 De Sotos. Appellant sold some buyers outside of the areas that had been assigned to its twelve associate dealers. Appellant between January, 1946, and December 30, 1949, date of trial, received 1,000 new De Sotos and Plymouth cars.

With only one Plymouth and one De Soto having been delivered to appellees, the appellant in July, 1946, mailed to the latter a notice of termination of the contract, which reads:

"Wood Motor Co.
"DeSoto-Plymouth
"July 5, 1946. Marshall, Texas.
"Nebel Motor Company,
"308 E. Tyler Street,
"Longview, Texas.
"Gentlemen:
"Re: Associate Dealer Agreement, "No. 481.
"Pursuant with paragraph nine, Termination by Notice, of the above captioned agreement, you are hereby notified that this agreement will be terminated on October 5, 1946, unless it is your desire to make this termination effective at an earlier date by mutual written consent.
"Very truly yours,
"(Signed) S. W. Wood, Jr., Pres.
"C/c: Mr. Frank Garard, Regional Manager.
"Mr. C. E. Heard, District Manager.
"Registererd letter—return receipt requested."

The president of appellant testified that in January, 1946, he had decided to terminate the contract because he had become dissatisfied in 1945, with the way appellees had maintained their service department and because appellees had displayed the DeSoto automobile contrary to a plan to keep all DeSotos under wraps until all dealers could exhibit the model at one time; that he reprimanded appellees about this breach when the Plymouth was delivered a few days later. He did not inform appellees of such intent (until above letter was written) as he "hoped to obtain a mutual termination agreement from appellees." We deem it unnecessary to detail appellees' version of above.

The jury found that prior to July 5, 1946, Wood Motor Company breached its contract with plaintiff by its failure to deliver to the latter its proportionate share of available new automobiles; and plaintiff had sustained $6,000 damages prior to July 5, 1946, as a result of such breach. In response to special issue No. 3, the jury answered that Wood Motor Company, under the facts of the case, waited an unreasonable length of time from and after January 19, 1946, to give plaintiff written notice terminating the contract. The jury found in response to special issue No. 4 that appellant did not have a just cause for terminating the contract as of July 5, 1946; and to No. 5, plaintiff had sustained $19,000 damages since the termination of the contract on July 5, 1946. In response to an issue requested by defendant, the jury found that plaintiff did not breach the contract.

Appellant asserts here as was urged in support of its motion for an instructed verdict and for judgment non obstante veredicto that by reason of Secs. 4 and 9, later herein set out, that it is not liable for its failure to deliver any automobiles; nor for damages for failure to comply with the contract after same had been terminated under Sec. 9 and it was not necessary to show just cause for termination. The trial court rejected this asserted unilateral construction of the contract.

Under terms of the agreement exclusive of Secs. 8, 9, 10 and 22, appellees agreed to provide and maintain an adequate plant

for the sale and service of the cars and parts they buy from appellant; to submit weekly their orders for cars and to make reports of new and second hand cars on hand when required. The contract designates the City of Longview, Gregg County, Texas, as the area assigned to appellees for the sale of DeSoto and Plymouth products. The agreement provides for the protection of the parties in the event of price increases or decreases. Appellant agreed to furnish from time to time the prices of vehicles, parts and accessories, together with schedule of discounts and terms of purchase. Secs. 11 to 21, both inclusive, deal with appellees' duty to maintain parts and services to meet the requirements in the area; to advertise the products in manner approved by direct dealer, the maintenance of certain required bookkeeping system, the method of collections and other provisions not necessary to detail. The purchase agreement deals with the modes of shipment; method of payment; right to divert a shipment upon failure of appellees to pay a sight-draft; claims for shortages; uniform warranty of products; discounts; transportation charges and delivery of parts.

Among the "purposes of this agreement" as stated in the contract are: "to set forth in a clear and understandable way the terms under which the parties agree to do business together and thus to facilitate associate dealer's purchase and resale of De-Soto and Plymouth products"; "the mutual effort being directed to provide the public with improved designs * * * in the confidence that in so doing the most stable and profitable business for both will be built and maintained"; "associate dealer invests his capital * * * applies his efforts" with the sales and services and assumes responsibility to develop the sales and servicing of the products "in the area allotted to him *. * *" and to this end the expenditures for a proper plant equipment in Longview hereinabove detailed were required of appellees; "essentially the arrangements seek to make it easier for associate dealer to buy motor vehicles and parts from direct dealer and easier for the public to buy * * * from associate deal-er"; and "in order to promote this result, direct dealer endeavors to provide associate dealer with products of a quality that will render good service * * * and to cooperate with associate in effectively merchandising its products to the public * * *"

It is observed from above brief summary of a twenty-four page printed contract with its thirty-eight sections, largely in general terms, all prepared by Chrysler, and by appellant tendered to appellees for execution, that many definite promises and duties were exacted from appellees on one hand with only a few reciprocating promises made by appellant and these to some extent modified by various conditions and saving clauses. But irrespective of this characteristic of its provisions the conclusion is inescapable that the parties intended by its terms to mutually develop and maintain the area assigned to appellees into a mutually profitable venture in the sale of these cars, parts and accessories, and to accomplish this end the direct dealer impliedly, if not expressly, agreed to sell to appellees the required products, from whom appellees expressly agreed to buy. Litigants knew of all the terms and provisions of the contract at the time it was signed and executed.

In 10 Tex.Jur. (Contracts), Sec. 95, applicable here, it is stated: "Though a contract on its face and by its express terms may appear to be obligatory on one party only, if it is manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such a corresponding and correlative obligation will be implied, and the contract held to be mutual * * * as where the act to be done by the party expressly binding himself can only be done upon a corresponding act being done or allowed by the other party." See also 17 C.J.S., Contracts, § 100b. For the application of this principle in construction of contracts of substantially similar characteristics, see Ellis v. Dodge Bros., 5 Cir., 246 F. 764; Mills-Morris Co. v. Champion Spark Plug Co., 6 Cir., 7 F.2d 38; Kane v. Chrysler Corp., D.C., 80 F.Supp. 360; Bowen v.

Virginia Lee Candies, Inc., Tex.Civ.App., 44 S.W.2d 502; Clement v. Producers' Rfg. Co., Tex.Com.App., 277 S.W. 634; Big Four Ice & Cold Storage Co. v. Williams, Tex. Civ.App., 9 S.W.2d 177. As stated in Kane v. Chrysler, supra, 80 F.Supp. at page 363, applicable here, the court in construing a contract of similar terms stated: "Contracts such as here involved are neither pure sales contracts nor pure agency contracts. They have been developed to meet the distribution needs of manufactured products where such distribution cannot be had upon merit alone. In many cases the product or model is new and the sales must be encouraged by expensive show rooms, service stations and by intensive and extensive advertising and salesmanship. The services of the dealer call for a considerable investment with uncertain result. * * * The contracts are entered into in good faith by both parties and utilized by business men and must be given a construction in accordance with the intent of the parties. Merely because the exact obligation of the parties may not be clearly stated is no reason to fail to see the obligation inherent in almost every line of the contract itself. * * * The very meticulous provisions for termination of the agreement (Secs. 8 and 9) imply there was some agreement to be terminated, for it is difficult to understand the detailed methods of terminating a contract which the parties knew did not exist and had no binding force."

Section 4 in the purchase agreement provides: "Direct dealer shall have the right to accept, in whole or in part any or all orders received, and shall not be liable for any loss or damage resulting from its failure to ship or deliver goods ordered." It is by virtue of this provision that appellant asserts that it is not liable in any damages for its failure to deliver any automobiles.

The purchase agreement which includes Sec. 4 is by reference made a part of the main agreement which sets out as hereinabove detailed the reasons for making a written contract and the respective promises of litigants. Sec. 22, styled "Force Majeure" of the main agreement, provides:

"Neither direct dealer nor associate dealer will be liable for failure to perform its part of this agreement when the failure is due to fire, flood, strikes or other industrial disturbances, inevitable accident, war, riot, insurrection or other causes beyond the control of the parties."

Under the well known principles of interpretation detailed in 3 Williston on Contracts, Secs. 618 to 621, both inclusive, and 624, 628; 10 Tex.Jur. (Contracts), Secs. 159, 162, 163, 164, 166, 168, 172, 179, 181, the "contract must be construed as a whole, each clause being construed with reference to every clause; a presumption at variance with the effect of the other provisions of a contract will not be raised upon a single one of its provisions; that a purpose which might be inferred from the language of a particular clause, when considered alone, is not controlling where it is expressly negatived by a subsequent clause; that a reasonable construction will be given a clause susceptible to two constructions, one reasonable and one unreasonable, in order to prevent the clause operating as a forfeiture, to prevent injustice, and to prevent one party being placed at the mercy of the other; that a term of phrase will ordinarily be considered to have been used in the same sense in different parts of the same instrument, particularly where that term or phrase has been specifically defined or explained at one point of the instrument; that language will be interpreted most strongly against the party using it or preparing the instrument."

The application of above principles of construction, the mutually expressed intent to buy and sell new automobiles and to establish and maintain a profitable business in the area so disclosed by the contract, and appellees' large expenditures made in preparation repel the claim that appellant when it was able to perform could without a reasonably just reason refuse to perform. Justice and fair dealing reject such a claim. Jay Dreher Corp. v. Delco Appliance Corp., 2 Cir., 93 F.2d 275; Chevrolet Motor Co. v. Gladding, 4 Cir., 42 F.2d 440; Kane v. Chrysler Corp., D.C., 80 F.Supp. 360; Beaumont Irrigating Co. v. Gregory, Tex.Civ. App., 136 S.W. 545; Phelps v. Connellee,

Tex.Civ.App., 278 S.W. 939, Id., Tex.Com. App., 285 S.W. 1047; Swift & Co. v. Columbia Railway, Gas & Elec. Co., 4 Cir., 17 F.2d 46, 51 A.L.R. 990–1020.

To accede to appellant's contention would be to strike down this "force majeure" clause. It, too, is a part of the contract. In fact, Sec. 4 is a subordinate provision of the contract. Logical effect can be given to both clauses in the conclusion that "the failure" mentioned in Sec. 4, but not therein defined, is the failure for any of the reasons mentioned in the "force majeure" clause. If any failure without rhyme or reason to perform would excuse, appellant could have so clearly stated in Sec. 4. It did not. Secs. 8 and 9 of the main agreement to be discussed under the next point further refute this claim that appellant could with immunity refuse to deliver new cars without any reason.

Sec. 8 of the main agreement reads: "Reasons for termination other than by notice—While it is the desire of direct dealer to establish lasting arrangements with associate dealer, it is recognized that certain conditions may arise in which it is impracticable for this agreement to continue in effect. In the interest of friendly relations between associate dealer and direct dealer, it is important that the circumstances be set forth so that they may be thoroughly understood by both parties to this agreement. Accordingly it is agreed that this agreement shall terminate immediately by its own force without notice from either party in the event of (1) an attempted assignment of this agreement by associate dealer without direct dealer's written consent; (2) an assignment by associate dealer for the benefit of creditors; (3) the admitted insolvency of associate dealer; (4) the institution of voluntary or involuntary proceedings by or against associate dealer in bankruptcy or under insolvency laws or for corporate reorganization, or for a receivership or for the dissolution of Associate Dealer; (5) the admitted insolvency of any member of associate dealer if a partnership; or (6) the discontinuance of associate dealer's representation in his sales area of the products herein referred to. Termination under this paragraph shall not impose any liability upon direct dealer under the provisions of Paragraph 9. It is further agreed by Associate Dealer that he will immediately advise direct dealer in writing of the occurrence of any event specified in this paragraph."

Sec. 9 reads: "Termination by Notice—It is also recognized that certain other conditions may arise under which either party may desire to terminate this agreement by giving reasonable notice to the other party. Accordingly it is agreed that this agreement may be terminated at any time upon not less than ninety (90) or more than ninety-five (95) days' written notice by direct dealer or upon less than fifteen (15) or more than twenty (20) days' written notice by associate dealer, but either of these periods may be reduced by mutual written consent of associate dealer and direct dealer. Termination of this agreement shall operate as a cancellation of all unfilled orders for motor vehicles, parts and accessories. Upon termination under the provisions of this Paragraph 9 by direct dealer or by associate dealer, direct dealer agrees to buy, and associate dealer agrees to sell within thirty (30) days after the effective date of termination * * *."

Various paragraphs in Sec. 9 which follow above quoted portion, and which deal with methods of ascertaining prices of products, tools, etc., to be paid associate dealer on a termination, are omitted.

Appellant asserts that it is not liable for damages for failure to comply with the contract after same had been terminated under the terms of Sec. 9, and it was not necessary to show just cause for termination.

It is to be observed that after setting out certain reasons in Sec. 8 by which the contract could be terminated without notice, Sec. 9 then proceeds to provide, that "Also * * *. certain other conditions may arise under which either party may desire to terminate * * *". The "other conditions" are not defined. Our courts have interpreted ambiguous termination clauses of contracts very strictly against the party preparing or furnishing the contract as here.

The reason for this rule, and applicable to this record, is that stated by the Supreme Court of Texas in Faulk v. Dashiell, 62 Tex. 642, 646, 50 Am.Rep. 542: "Where doubt exists as to the construction of an instrument prepared by one party, upon the faith of which the other party has incurred obligations or parted with his property, that construction should be adopted which will be favorable to the latter party; and where an instrument is susceptible of two constructions—the one working injustice and the other consistent with the right of the case—that one should be favored which upholds the right. And where the language of a promisor may be understood in more senses than one, it is to be interpreted in the sense he knew or had reason to suppose it was understood by the promisee." See also Decker v. Kirlicks, 110 Tex. 90, 216 S.W. 385.

The expressed intent in the agreement that the parties were entering same with the mutual intent to provide the area with designs and quality cars so that the most stable and profitable business for both will be built and maintained, and the expenditure by appellees as required by appellant in the establishment of the business plant in Longview dispute the claim that the contract could be terminated without a reasonably just cause or condition. Surely the phrase in Sec. 9 which reads "certain other conditions may arise" following the terms of Sec. 8 would not substitute the provision that the contract can be terminated at the "arbitrary will" of the appellant. Logic and equity answer that "such other condition" to justify a termination should be based upon at least a reasonably just cause, such as, for example, the failure or delinquency of appellees to perform their obligation under the contract, or even a physical personal encounter. Here this issue, a fact issue, the jury has found that appellant terminated the contract without just cause. It is our conclusion that under this record appellant was unauthorized under the contract to terminate same without at least a reasonably just cause. Barish v. Chrysler Corp., 141 Neb. 157, 3 N.W.2d 91; Yazugian v. J. Rich Steers, Inc., 195 Misc. 694, 89 N.Y.S.2d 551; Decker v. Kerlicks,

110 Tex. 90, 216 S.W. 385; Knight v. Chicago Corp., 144 Tex. 98, 188 S.W.2d 564; Cammack v. R.-L. Lumber Co., Tex.Civ. App., 258 S.W. 488, w/r. As expressed in Wigand v. Bachmann-Bechtel Brewing Co., 222 N.Y. 272, 118 N.E. 618, 619, "Before it is found that the parties intended to make so one-sided a contract as claimed by the defendant, such intention should appear with sufficient certainty to require such a finding."

A written contract construed by our Supreme Court in Ford Motor Co. v. Maddox Motor Co., 123 Tex. 608, 73 S.W.2d 517, Id., Tex.Com.App., 23 S.W.2d 333, contained paragraphs Nos. 6 and 17 which appellant asserts are comparable to the provisions of Secs. 4 and 9 in the instant contract. Appellant earnestly insists that the holding in above Maddox contract supports its claim of non-liability here. Paragraph 6 of that contract reads: "Company (Ford) agrees that the estimate and shipping specifications of the dealer will receive company's careful attention, but company does not agree absolutely to fill them, but expressly reserves the right to refuse them from time to time, or such parts of them as company deems necessary or proper, and all such estimates are subject to delays occurring from any cause whatsoever in the manufacture and delivery of its product—no legal liability to fill such estimates being incurred under any circumstances * * *"

Paragraph 17 reads: "This agreement shall continue in force and govern all transactions between the parties hereto until cancelled or terminated by either party, but it is agreed that either party shall have the privilege, with or without cause, to cancel and annul this agreement at any time upon written notice, by registered mail, or personal delivery of notice to the other party, and such cancellation shall also operate as a cancellation of all unfilled retail and other orders * * * which may have been received by the company from the dealer prior to the date when such cancellation is served."

It appears from above opinions that the Supreme Court held that the two quoted paragraphs were a part of Maddox's contract irrespective of his asserted oral agree-

ment with the company, the court pointing out, that,—"Paragraph 6 then proceeds to further provide, 'no legal liability to fill such estimates being incurred under any circumstances.' It is certainly not possible for us to hold that a contract containing above provisions obligated Ford Motor Company to sell Maddox Motor Company such products the trade needs of Maddox * * * required for six years." "* * * it would be contrary to reason to hold that the latter oral agreement adopted the terms of the written contract * * * without the provisions in regards to the right of cancellation and termination."

We are unable to agree with appellant that the construction of the contract and matters involved in the Maddox case controls the construction to be made of the instant written contract. Paragraph 6 of the Maddox written contract provides—"No legal liability to fill such estimates being incurred under any circumstances * * *" but the contract does not contain a provision comparable to Sec. 22, the "force majeure" clause, as here. Sec. 4 of the instant clause provides: "* * * shall not be liable for its failure to * * * deliver goods ordered," qualified under Sec. 22, a part of the contract, "when the failure is due to fire, floods, strikes * * * or other causes beyond the control of the parties." Paragraph 17 of the Maddox case provides "that either party shall have the privilege, with or without cause, to cancel and annul the agreement at any time * * *" It is observed that the Maddox contract plainly provided that same could be terminated with or without cause. In the instant contract the right of termination is qualified under the various conditions set out in Sec. 8, hereinabove detailed, and in Sec. 9 the existence of "certain other conditions" not defined in the contract, and hereinabove construed to be certain conditions that would give rise to a reasonably just cause.

▮▮▮ Under the remaining proposition appellant contends that the "evidence is insufficient to support the jury finding that plaintiff had been damaged $19,000 after the cancellation of the contract," and such find-ing cannot form a basis for any part of the judgment.

The number of new DeSoto and Plymouth cars that appellant did receive from the factory during the period of time involved, the population of the respective areas, and the prior record of sales in the respective areas assigned to the associate dealers and that of the direct dealer were used as the method of computing the number of cars which appellees would have received under the contract prior to the cancellation date and the period subsequent thereto. Litigants were not in accord with the estimate of the population of certain areas which would affect the calculation as to the number of cars each would have been entitled to. The net profits were computed on the supposed observance of the government regulations on the retail price of cars. It appears that appellees were experienced dealers, and from their testimony had taken deposits on fifty cars at the cancellation date and with appellants' cooperation would have contracted many more sales. Appellees claim it was too late to secure a new car agency at the cancellation date, that a purchase of a franchise then from another dealer would have cost $250,000; and such money they did not have. Appellees estimated their net profits on sale of the products through 1946 to 1949 would have been $50,000. He enumerated cost of various items, a total of $20,750, that he had expended in making his improvements and the installation of equipment in establishing this agency.

It occurs to us from the reading of the issue to which the jury answered $6,000, that this was based upon an estimate of the cars that appellees would have received under the contract prior to the cancellation date. The evidence supports the finding.

▮▮▮ If we are correct in our conclusion that appellant cancelled the contract without just cause, then lost profits and expense outlays are to be considered in estimating the damages, and in this connection the number of new cars that appellees would have received of the 1,000 new cars handled by appellant up to the date this suit was

**780**

filed would in large part, alone, support the award of $19,000 damages.

The "force majeure" clause, above set out, required appellant, in the event of a condition beyond his control partially preventing performance of his obligations to sell and deliver to appellees their full requirements for the new cars, to pro rate his available supply of same to appellees and the other associate dealers similarly situated according to the size of their respective requirements. Raywood Rice Canal & Milling Co. v. Erp, 105 Tex. 161, 146 S.W. 155; 55 Corpus Juris (Sales), Sec. 374(b); B. P. Ducas Co. v. Bayer Co., Sup., 163 N.Y.S. 32. With respect to lost profits and expense outlays as an item of damages, see S. W. Battery Corp. v. Owen, Tex.Civ. App., 97 S.W.2d 306, Id., 131 Tex. 423, 115 S.W.2d 1097; Osage Oil & Refg. Co. v. Lee Farm Oil Co., Tex.Civ.App., 230 S.W. 518, w/r.

The judgment of the trial court is affirmed.